## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

In re: Julia C. Nedrick,                    Case No. 10-34772-KLP
     Debtor                              Chapter 7

Walton M. Belle,
     Plaintiff,


v.                                          Adv. Pro. No. 16-03258-KLP

Harry Shaia, Jr., Chapter 13 Trustee, and
Julia C. Nedrick,
     Defendants.

---

In re: Cecil Hubert Nedrick,                Case No. 10-33456-KLP
     Debtor                              Chapter 7

Walton M. Belle,
     Plaintiff,


v.                                          Adv. Pro. No. 16-03257-KLP

Harry Shaia, Jr., Chapter 13 Trustee, and
Cecil Hubert Nedrick,
     Defendants.

## <u>MEMORANDUM OPINION</u>

Before the Court are cross-motions for summary judgment filed by the

parties in two separate but essentially identical adversary proceedings.  The

parties have stipulated that venue is proper in this Court pursuant to 28

U.S.C. §§ 1408 and 1409 and that these adversary proceedings are core

proceedings under 28 U.S.C. § 157(b)(2)(A) and (O).  The Court also finds that

the actions are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B) and (K).

Plaintiff Walton M. Belle initiated both adversary proceedings on

August 15, 2016.  Each complaint contains the same three counts.  Count I

seeks recovery pursuant to a setoff right under Va. Code § 49-27, Count II

seeks recovery pursuant to "Dissolution of LLC as required by Virginia law,"

specifying Va. Code Ann. § 13.1-1050.2(C), and Count III seeks recovery on

the grounds of unjust enrichment.

### Facts

The parties maintain that they have stipulated to all relevant facts

and agree that no genuine dispute exists as to any material fact relevant to

this proceeding.  The facts from the parties' stipulation (the "Stipulation")

appear below:[1]

Debtors Julia C. Nedrick and Cecil Hubert Nedrick (collectively "the

Nedricks") are married to each other.  On July 7, 2010, Debtor Julia C.

Nedrick filed a voluntary petition under chapter 13 of the Bankruptcy Code,

Case No. 10-34772, which was converted to chapter 7 on March 21, 2014.

Harry Shaia, Jr., was appointed as the chapter 7 trustee in the case.

On May 13, 2010, Debtor Cecil Hubert Nedrick filed a voluntary

petition under chapter 13 of the Bankruptcy Code, Case No. 10-33456, which

was converted to chapter 7 on March 21, 2014.  Harry Shaia, Jr., (the

---

[1] The Stipulation was filed in each adversary proceeding.  This recapitulation of the Stipulation is largely verbatim but has been edited slightly for ease of comprehension.  The facts of the Stipulation have not been changed.  The Court has placed certain of the stipulated language in quotation marks to emphasize that the particular stipulated provision is the parties' own language and may include legal conclusions not binding upon the Court.

"Trustee") was appointed as the chapter 7 trustee in Cecil Nedrick's case as well.

Plaintiff Walton M. Belle ("Belle") was previously married to Armond A. Belle (collectively "the Belles"), who is deceased. Upon her death, all of Armond Belle's assets were devised to Walton Belle.

On or about February 22, 2005, Julia Nedrick formed a Virginia limited liability company known as CHN Development, LLC ("CHN" or the "Company"). In June of 2007, the Belles joined the Nedricks in CHN, with each individual acquiring a twenty-five percent membership interest. Julia Nedrick was appointed as the sole manager of CHN in the CHN operating agreement (the "Operating Agreement").[2] She remained in that position until the filing of her bankruptcy petition in 2010.

CHN was originally formed for a different purpose but was ultimately used to purchase real property located at 2423 North Lombardy Street in Richmond, Virginia (the "Property"). According to the records of the City of Richmond, CHN purchased the Property on June 26, 2007, for $550,000. This purchase price equaled the combined contributions paid by the four members for their respective membership interests in CHN.

The Belles paid for their membership interests by making a cash payment of $275,000. The Nedricks' membership interests were funded by their payment of $275,000, of which $102,500 came from their own funds and $172,500 came from a personal loan they obtained from the Belles, evidenced

---

[2] A copy of the Operating Agreement is attached to each complaint as Exhibit A.

by a $172,500 promissory note (the "Note") dated June 21, 2007 from the

Nedricks that was made payable to the Belles.  The Note was secured by a

purchase money deed of trust (the "Deed of Trust") executed by CHN on the

Property.

Pursuant to the Operating Agreement, upon the "insolvency" (defined

to include the filing of an "insolvency" petition) of the manager, CHN would

be dissolved and the affairs wound up with its assets liquidated in an orderly

fashion, its liabilities satisfied and remaining proceeds distributed to the

CHN members according to their ownership interests. "The filing of Julia

[Nedrick]'s Bankruptcy . . . Petition mandated the dissolution and

termination of CHN pursuant to paragraph 12(a) of the Operating

Agreement.  Prior to Julia's bankruptcy, no successor Manager was elected."[3]

The CHN corporate charter was revoked and terminated by the Virginia

State Corporation Commission on or about May 31, 2015, as a result of the

failure of CHN to file appropriate fees.

Following the dissolution of CHN, the Trustee, "as successor to the

rights of Julia [Nedrick] as Manager," began the process of winding down

CHN by, among other things, the proposed auction sale of the Property,

which was the primary asset of CHN.  On December 14, 2015, the Trustee

moved to sell the Property pursuant to § 363(b) of the Bankruptcy Code.  By

order entered January 13, 2016 (the "Order"), the Court granted the Trustee

permission to sell the Property via an auction sale, free and clear of all

---

[3] Stipulation, ¶ 13.

existing liens and interests pursuant to § 363(f)(3) of the Bankruptcy Code and provided that any liens on the Property would attached to the sale proceeds.

The auction of the Property resulted in a high bid of $627,000. "The lien of the Deed of Trust was released from the Property by operation of the Order and the lien attached to the proceeds of sale. The sale proceeds which were company property of CHN were used to pay the Note which previously was not satisfied by the Nedricks."[4] "The amount paid to satisfy the Note was $255,429.19,[5] which was the balance due after paymenst [sic] of $89,621.14 had been made by the Nedricks over the years. This payoff included default interest at the rate of 18% per annum compared to the contract interest rate of 6%. The payoff calculated with the default interest exceeded the payoff calculate [sic] at the contract rate by $108,141.27. The Trustee paid auctioneer expenses, commissions from the sale and satisfied the Note and lien in full, resulting in net proceeds to CHN of $268,714.21. In addition to the sales proceeds, the Trustee is holding approximately $18,000 of CHN rent, which was generated from tenants on the Property prior to its sale. Their [sic] remains to be distributed as part of the continued wind down of CHN the approximate sum of $286,714.30."[6]

---

[4] Stipulation, ¶ 17. The Stipulation does not indicate that the high bid was accepted and the sale was completed, but the Court surmises from the remainder of the Stipulation that this took place.

[5] All other references by the parties to this amount list it as $255,429.10.

[6] Stipulation, ¶¶ 17-18.

Attached to the Stipulation are four exhibits: A) the Operating Agreement, B) a summary in graph form of the capital structure of CHN, C) the Note, and D) the Deed of Trust.

## Standard of Review

Rule 56 of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 56, made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 9014 and 7056, provides that a court shall grant summary judgment upon a showing that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Here, although each party opposes the granting of summary judgment in favor of the other, neither party points to the absence (or genuine dispute) of a fact necessary to rule in the other party's favor. The parties would have the Court accept, as they apparently are prepared to do, that only questions of law must be decided in order to properly resolve the issues before the Court.

## Analysis and Conclusions of Law

The papers filed by both the Trustee and Belle outline the following summary of funds received into the estate:

| | |
|---|---|
| Gross proceeds from sale[7] | 628,050.60 |
| Auction and Real Estate Commission | <70,100.62> |
| Real Estate Taxes and Closing Costs | <33,806.58> |
| Net Proceeds to CHN Dev. LLC | 524,143.40 |
| Net Cash in CHN Dev. LLC | 18,000.00 |
| Total received into the estate | 542,143.40 |

---

[7] This amount does not match the $627,000 high bid amount set forth in the Stipulation.

The essence of the parties' dispute is that they differ in their approach over how the net sale proceeds of $542,143.40 received by the Trustee should be distributed.  The Trustee proposes to first reduce the $542,143.40 amount by the $255,429.10 paid in satisfaction of the Nedricks' Note, resulting in $286,714.30 remaining to be distributed.  He then proposes to divide that amount equally between Belle (now the owner of a 50% share of the Company as a result of his wife's death) and the Nedricks.  Under this analysis, Belle would receive $143,357.15, and the Nedricks' bankruptcy estates would receive the other $143,357.15.

Belle, on the other hand, contends that the entire $542,143.40 should first be divided equally, resulting in $271,071.70 for himself and the same for the Nedricks' bankruptcy estates.  He maintains that by paying the Note, CHN became entitled to "reimbursement/setoff" from the Nedricks' share pursuant to Va. Code Ann. § 49-27.  He therefore seeks to reduce any distribution due to the Nedricks by the $255,429.10 paid by the Trustee relative to the Deed of Trust.[8]  This would result in a final distribution to the Nedricks' estates of only $15,642.60.[9]  This scenario would result in a total payment to Belle of the entire amount purportedly due under the Note as well as half of the proceeds from the liquidation of CHN's Property (in other words, what Belle would have received had there been no bankruptcy and

---

[8] This proposed offset would arguably have been a part of a CHN liquidation had neither of the Nedricks filed bankruptcy.

[9] If the proposed $15,642.60 payout to the Nedricks is deducted from the $286,714.30 the Trustee has on hand, the amount remaining is $271,071.70, the amount sought by Belle.

had the Nedricks simultaneously paid the balance owed under the Note at the default interest rate).

It would perhaps be easier for all concerned if the Court were willing to agree that the parties have presented the only two possible alternatives. The Court might then choose one of those alternatives and allow the parties to be on their respective ways. But the parties have chosen to invite the Court's scrutiny, and the Court is not yet convinced that only questions of law remain, thus making the path to choosing one, or neither, of the two alternatives more laborious. The lack of a sufficient record compels the Court at this stage of the proceedings to reject both proposed apportionments and deny both parties' summary judgment motions.

Under the Virginia Limited Liability Company Act, Va. Code Ann. §§ 13.1-1000 to 13.1-1087, a limited liability company is bound by its operating agreement, which regulates the conduct of its business and the relations of its members. *See* Va. Code Ann. § 13.1–1023(A)(1). CHN's Operating Agreement includes a number of provisions that appear pertinent yet remain unaddressed by the parties. The bankruptcies of two of its four members, including the managing member, trigger an inquiry into the effect of these provisions.

Paragraph 10(b)(iii) of the Operating Agreement prohibits the managing member from pledging the credit of the Company or from otherwise using Company property for other than Company purposes

"without the prior written consent of the other Members."  This provision

requires the written consent of all of the members as a prerequisite for Julia

Nedrick to have effectively executed, on behalf of the Company, the Deed of

Trust pledging the Property to secure her and her husband's obligation to the

Belles. There is nothing in the record to indicate that this requirement was

met, which raises the question of whether the transfer of the interest in the

Property pursuant to the Deed of Trust was *void ab initio*.  *See Han v. Yancey

(In re Kang)*, No. 1:15-CV-00953 (LMB/IDD), 2015 WL 5786692, at *7 (E.D.

Va. Sept. 30, 2015), *aff'd sub nom. Han v. Official Comm. of Unsecured

Creditors (In re Kang)*, 664 F. App'x 336, 340-41 (4th Cir. 2016).[10]  Without

an enforceable pledge of the Property to secure the debt owed solely by the

Nedricks, CHN would have no obligation to pay a portion of the sale proceeds

to Belle, and the full amount would presumably be available for distribution

to its members.[11]

---

[10] Va. Code Ann. § 13.1-1021.1(B)(3) provides that "[a]n act of a manager, including
the signing of an instrument in the limited liability company name, for apparently
carrying on in the ordinary course the limited liability company business or business
of the kind carried on by the limited liability company, binds the limited liability
company, unless the manager had no authority to act for the limited liability
company in the particular matter and the person with whom the manager was
dealing knew or had notice that the manager lacked authority". Belle, as a
signatory to the Operating Agreement, is presumed to have had notice of the
Operating Agreement's written consent requirement.  Thus, the Company would not
have been bound by the Deed of Trust pursuant to Julia Nedrick's apparent
authority.

[11] Under 11 U.S.C. § 558, the bankruptcy estate has the benefit of any defense
available to the Nedricks, including any defense they may have against a claim for
reimbursement or a subrogation claim made pursuant to Va. Code Ann. § 49-27 or
11 U.S.C. § 509(a).  It would follow that if the Nedricks, and therefore the Trustee,
could successfully argue that the Deed of Trust was void, then the Company has no
"debt" available for offset pursuant to 11 U.S.C. § 553(a).

The Court also questions whether the Trustee, in his capacity as
chapter 7 trustee for managing member Julia Nedrick, has the authority to
liquidate CHN's assets.[12]  There is no clear indication that he is authorized to
do so, either pursuant to the Operating Agreement or otherwise.

Virginia law does not vest the Trustee with Julia Nedrick's
management rights solely by virtue of his having been appointed as her
bankruptcy trustee.  Virginia's Limited Liability Company Act states that,
except as otherwise provided in a company's articles of organization (which
are not a part of the record here) or operating agreement, a member is
dissociated from a limited liability company if the member becomes a debtor

---

The Court also notes that the implications of the apparent lack of
consideration for the transfer of an interest in the Property have not been addressed
by either party. The possibility that the Deed of Trust may be avoidable as a
fraudulent transfer may have provided an additional defense to the Company's
claims.

One might reasonably conclude that a more appropriate method of securing
the Nedricks' obligation to the Belles would have been through an assignment of the
Nedricks' ownership interests in the Company, which likely would have enabled
Belle to avoid the present complications.  For reasons unknown, this approach was
not utilized. In any event, there is no signature of the Belles on either the Note or
Deed of Trust, nor is there any other document evidencing the Belles' or Cecil
Nedrick's consent to the structure of the transaction.  The fact that it may have
subsequently been in the Belles' best interest to seek enforcement of the transaction
as entered into is of no consequence.

What is more, whether the Deed of Trust was enforceable could now be of
questionable consequence.  The Trustee has paid  the Nedricks' personal obligation
to Belle (although the record does not detail the circumstances under which the
obligation was paid), which might invite an argument by Belle that the Trustee has
waived any right to challenge the validity of the Deed of Trust or would be estopped
from doing so.  The waiver argument may be complicated by the further question of
whether the Trustee had the authority to act on behalf of the Company when
making payment to Belle.

[12] The Stipulations state that the Trustee was acting "as successor to the rights of
Julia[Nedrick] as Manager." Stipulation ¶ 15.  The failure to state any other basis
for this assertion suggests that the parties believe that this authority was conferred
upon the Trustee solely by virtue of his appointment as Julia Nedrick's bankruptcy
trustee.

in bankruptcy. Va. Code Ann. § 13.1-1040.1(6)(a).  Dissociation transforms the member's interest into that of an assignee.  Va. Code Ann. § 13.1-1040.2(A).  An assignment of an interest in a limited liability company does not entitle the assignee to participate in management affairs.  Va. Code Ann. §13.1-1039(A).

The Operating Agreement does not negate the effect of Virginia law, because it contains no language providing that the filing of a bankruptcy by the manager would not cause dissociation.  Instead, ¶ 12(a)(iii) of the Operating Agreement requires the dissolution of the Company upon the "insolvency" of the Manager.[13]  Bankruptcy may create a presumption of insolvency; however, the record does not establish that Julia was insolvent.  Nor does it follow that Julia's insolvency would automatically transfer her management rights.

The Operating Agreement cannot be construed to provide that there are any circumstances, other than pursuant to the written consent of the majority of other members, under which management rights would transfer to an assignee or bankruptcy trustee.  On the contrary, the Operating Agreement explicitly states that "[p]ersons other than those listed  . . . as Manager shall take no part in the management or control of the business of the Company and shall have no authority to act on behalf of or otherwise bind the Company."  Nowhere in the record is there evidence that the Trustee

---

[13] The Operating Agreement does not explicitly refer to "bankruptcy" but instead contemplates the potential filing of an "insolvency petition."  What is meant by this term is unclear.

obtained the consent of majority of the members of the Company to his

exercise of management rights.[14]  Consequently, whether Julia's non-

economic rights in the Company, in particular her management rights, may

be exercised by the Trustee is an unanswered question. *See Spain v. Williams*

*(In re Williams)*, 455 B.R. 485, 502 (Bankr. E.D. Va. 2011); *In re Garrison-*

*Ashburn, L.C.,* 253 B.R. 700 (Bankr. E.D. Va. 2000).[15]

There is the question of whether the Operating Agreement constitutes

an executory contract whose provisions may be properly terminated or

modified simply because the managing member, in this case Julia Nedrick,

filed a bankruptcy petition.  In *Endeka Enterprises, LLC v. Meiburger (In re*

*Tsiaoushis)*, No. 1:07cv436, 2007 WL 2156162, at *2 (E.D. Va. July 19, 2007),

the district court undertook an examination of whether the terms of an LLC's

operating agreement constituted an impermissible *ipso facto* provision in

---

[14] The Court is not comforted by Belle's consent to the sale of the Property that was
obtained after Belle objected to the Trustee's sale motion and which included certain
negotiated terms, nor is the Court willing to assume that the participation of all
members in the present litigation is tantamount to the Trustee's having obtained
the written consent of the majority of members to undertake management rights
and responsibilities.  Under ¶ 10(a)(iv) of the Operating Agreement, Belle's consent
to the sale would not have been necessary if the Trustee had acquired management
rights because that section grants the Manager the unilateral right to sell or
otherwise transfer Company assets on such terms as he or she may deem proper.
[15] A chapter 7 trustee's authority to sell property of the bankruptcy estate pursuant
to 11 U.S.C. § 363 does not necessarily extend to the liquidation of assets owned by
an LLC not wholly owned by the debtor.  Having obtained a consensual sale order
from the other member of the LLC, one might consider whether it would be prudent
to also seek authority to operate the business of the debtor pursuant to 11 U.S.C.
§ 721, even if only for the purpose of winding up the affairs of the business, and to
discuss with the United States Trustee whether it would be necessary to acquire a
separate bond. *See* Administrative Office for United States Trustees, Handbook for
Chapter 7 Trustees, 4-29 to 4-31 (2012).

violation of the terms of § 365(e) of the Bankruptcy Code.[16]  In this context,

an *ipso facto* provision is a law or contract provision specifying that a

bankruptcy filing *per se* will terminate or modify a lease or executory

contract.[17]  The operating agreement at issue in that case provided that the

company would be dissolved upon the "death, resignation, expulsion or

bankruptcy of a Member or occurrence of any other event that terminates the

continued Membership of a Member in the Company." 2007 WL 2156162, at

*1.  The district court, in determining that the particular operating

agreement before it was not an executory contract subject to the nullification

provisions of § 365(e), stated that "we find no per se rule governing this issue.

Rather, as did the bankruptcy court and the other courts that have addressed

this issue, we must analyze the particular operating agreement at issue to

determine whether it contains material, continuing obligations between the

members that would qualify it as an executory contract."  2007 WL 2156162,

at *3.  The court further noted that a court must examine the facts and

circumstances of each particular case. 2007 WL 2156162, at *3, n.4.  Such an

---

[16] All references to the Bankruptcy Code are to 11 U.S.C. §§ 1-1532.

[17] Section 365(e) of the Bankruptcy Code provides that:

> (e)(1)  Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--
> (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
> (B) the commencement of a case under this title; or
> (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

inquiry in this case would present the Court with additional unaddressed

questions of fact.

Yet another potential issue is whether the management duties of Julia

Nedrick became property of her bankruptcy estate in light of the *ipso facto*

provisions of § 541 of the Bankruptcy Code, which defines "property of the

estate." Section 541(c)(1)(B) provides that:

> an interest of the debtor in property becomes property of the
> estate . . . notwithstanding any provision in an agreement,
> transfer instrument, or applicable nonbankruptcy law that is
> conditioned on the insolvency or financial condition of the
> debtor, on the commencement of a case under this title, or on the
> appointment of or taking possession by a trustee in a case under
> this title or a custodian before such commencement, and that
> effects or gives an option to effect a forfeiture, modification, or
> termination of the debtor's interest in property.

The court in *In re Garrison-Ashburn, L.C.,* found that § 541 of the

Bankruptcy Code does not prevent the application of the dissociation

provision of Va. Code Ann. § 13.1-1040.1(6)(a) ("All the rights and privileges

Chapman had immediately prior to filing became property of his bankruptcy

estate. Unless otherwise provided in the Bankruptcy Code, the rights and

benefits were burdened with all of the duties and obligations that came with

them. Consequently, unless precluded by § 365(c) or (e), his bankruptcy

estate has only the rights of an assignee under § 13.1–1039.") (253 B.R. at

708).[18]

---

[18] In *In re Garrison-Ashburn, L.C.*, 253 B.R. 700 (Bankr. E.D. Va. 2000), the court
also made a factual finding that operating agreement at issue was not an executory
contract and thus § 365's *ipso facto* prohibition was inapplicable.

However, in *Official Committee of Unsecured Creditors v. Virginia Broadband, LLC (In re Virginia Broadband, LLC)*, 498 B.R. 90, 93-94 (Bankr. W.D. Va. 2013), the Bankruptcy Court for the Western District of Virginia found that "a membership interest in a Virginia LLC is personal property [and] [a]s such, the membership interest is the property and any interest, whether economic or noneconomic, in that property would become property of the estate under section 541(c)(1) despite Virginia law to the contrary.  To say that 541(c)(1) makes the economic interest, but not the noneconomic interest, property of the estate confuses the issue of what becomes property of the estate with what rights and powers the debtor has in that property upon the commencement of his bankruptcy case." *Id.* at 96. The court held that Va. Code Ann. § 13.1–1040.1(6)(a) is an impermissible *ipso facto* provision under § 541(c)(1)(B).

*Garrison-Ashburn* and *Virginia Broadband* present differing views of the applicability of Virginia's dissociation provisions; however, the Court is not required to opine upon which view should prevail, because the outcome does not affect its decision to deny the summary judgment motions.  Rather, the discussion serves to further illustrate the current lack of a sufficient record.

The Court is aware that it entered a consent order authorizing the Trustee to liquidate the Property, but this cannot be construed to have granted authority to the Trustee beyond the sale of one asset.  The Company

is a separate entity with its own assets, liabilities and affairs that must be addressed by its manager.  The Trustee cannot simply dip his toe into the pool of management responsibilities only as necessary to protect the rights the members whose interests he otherwise represents.[19]

Although the parties may agree that there are no outstanding liabilities of the Company to third parties, Va. Code Ann. §13.1-1035 imposes a higher level of certitude on the part of a liquidating agent, requiring financial statements or "[an]other method that is reasonable in the circumstances" before a distribution may be made to members.  There is nothing in the record regarding any remaining CHN liabilities to others.  A simple, unsubstantiated declaration by counsel at oral argument that no such liabilities exist falls short of satisfying this requirement.

One may also question whether it is prudent for the Trustee to act as the fiduciary to the two bankruptcy estates while also serving as the liquidating agent for the Company even if he is not prohibited from doing so. Were the Trustee to assume the obligation to wind up the Company pursuant to Va. Code Ann. §13.1-1048, he would be authorized to prosecute and defend suits and would be required to collect the Company's assets.  Thus, he would

---

[19] Paragraph 12(h) of the Operating Agreement requires the Manager to take action to reconstitute the Company, if appropriate, to continue its existence if the Company is terminated for failure to pay required fees to the State Corporation Commission. The Trustee has apparently elected not to reinstate the formal existence of the Company but instead to liquidate its assets.  Winding up the affairs of an LLC typically involves the assistance of professionals, such as an accountant who will prepare final tax documents.  The Trustee's proposed distribution appears to make no provision for payment of the administrative expenses associated with these duties.

seemingly be obliged to assert the Company's setoff rights against the
Nedricks' distribution claims in order to maximize the Company's assets.
Yet, arguably contrary to the best interest of the Company, the Trustee is
opposing rather than asserting the setoff claims.  That such opposition is in
the best interests of the bankruptcy estates may justify the Trustee's actions
considering that Belle, who appears to be the only adversely affected party, is
actively asserting the Company's claims for his own interests; nevertheless,
the optics are disconcerting.[20]

Also complicating the proceedings is Belle's apparent lack of standing
to assert the Company's setoff rights.[21]  Neither the Operating Agreement
nor Virginia law confers standing on Belle to bring an adversary proceeding
asserting, on behalf of the Company, setoff rights against its members.  Va.
Code Ann. § 13.1-1042 prohibits derivative suits by a member of a limited
liability company unless certain conditions are met, and Belle has not
demonstrated compliance with these conditions.

Even if the Court were to entertain Belle's suit as an allowable
declaratory judgment action,[22] requesting a determination of the rights of the

---

[20] *See also Merritt Commercial Sav. & Loan, Inc. v. Guinee*, 766 F.2d 850, 854-55
(4th Cir. 1985) (surety may compel a creditor to assert a setoff right that would
reduce its liability).
[21] The Trustee challenged Belle's standing in his answer to the complaint in each
adversary proceeding.
[22] 28 U.S.C. § 2201(a) provides that:
  "In a case of actual controversy within its jurisdiction, except with
  respect to Federal taxes other than actions brought under section 7428
  of the Internal Revenue Code of 1986, a proceeding under section 505
  or 1146 of title 11, or in any civil action involving an antidumping or

parties vis-à-vis the legitimacy of the Company's right to set off its claim against the distribution claims of the Trustee in order to give direction to the Trustee in his capacity as liquidating agent for the Company, the analysis requires further evidence.  It is not simply a matter of determining whether setoff rights exist. If the Company possesses setoff rights pursuant to 11 U.S.C. § 553, then the statute requires a determination of the extent of those rights. *See, e.g.*, *United States v. Ruby (In re Grannan)*, Adv. Pro. No. 01-5043-S, 2002 WL 1760824, *3-4 (Bankr. E.D. Va. June 20, 2002).

Despite the Court's inability to make a complete final disposition at this stage of the proceedings, the Court may grant partial summary judgment as to the ability of the Company to assert setoff rights. *See* Fed. R. Bankr. P. 7056(a), (g).  A grant of partial summary judgment in favor of the Trustee would be appropriate were the Court to determine that, viewing the facts in the light most favorable to Belle, the Company would have no setoff rights as a matter of law.  Having considered the provisions in the Bankruptcy Code and applicable state law, the Court concludes that the Trustee is not entitled to partial summary judgment on this issue.

Subject to limitations set forth in the statute, Bankruptcy Code

---

countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

§ 553(a) provides that bankruptcy "does not affect any right of a creditor to

offset a mutual debt owing by such creditor to the debtor that arose before

the commencement of the [bankruptcy] case . . . against a claim of such

creditor against the debtor that arose before the commencement of the

case . . . ." 11 U.S.C. § 553(a).  "The term 'debt' means liability on a claim."

11 U.S.C. § 101(12).  Viewing the facts in the light most favorable to Belle

and therefore assuming a proper pledge of the Property, the Company is a

"creditor" of the Nedricks, as defined under the Bankruptcy Code.[23]  The

Trustee, on behalf of the bankruptcy estates[24] and as the assignee of the

Nedricks' membership interests in the Company,[25] has a claim against the

---

[23] 11 U.S.C. § 101(10)(A) states that the term "creditor" means an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."  "Claim" is defined in relevant part as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).  Assuming its enforceability, the Deed of Trust secured the Nedricks' debt to the Belles, resulting in the Company having a contingent claim against the Nedricks that would come due in the event it paid off the Note.  *See Lambert v. Callahan* (*In re Lambert Oil Co., Inc.*), 347 B.R. 508, 513 (W.D. Va. 2006).

Surprisingly, Belle contends that the Company is not a creditor of the Nedricks.  "The Trustee suggests that CHN failed to file a proof of claim [sic] the Nedrick bankruptcy and failed to assert its setoff rights.  *CHN is not a creditor of the Nedricks* and there is no basis for CHN to file a claim in the Nedrick bankruptcy." Response to Trustee's Amended Memorandum in Support of Motion for Summary Judgment, Adv. Pro. No. 16-03587-KLP, ECF Docket 30, p. 3 and Adv. Pro. No. 16-03258-KLP, ECF Docket 19, p.3 (emphasis added).  Moreover, ¶ 28 of each complaint avers that "[t]he satisfaction of the Note did not pay 'company debts,' but rather satisfied the personal debt of the Nedricks.  Accordingly, the payment of the Note should not be accounted for as a satisfaction of a 'company' debt."  Belle's interpretation of the facts would lead one to conclude that the Trustee used the Nedricks' distributions, assets of the bankruptcy estates, to pay a prepetition unsecured debt without Court approval.

[24] The bankruptcy estate "is comprised of all . . . legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).

[25] *See* Va. Code Ann. §§13.1-1040.1 and 1040.2.

Company for any distributions the Company makes pursuant to Title 13.1 of the Virginia Code.[26]  Both debts arose before the Nedricks filed bankruptcy in 2010.[27]

Section 553(a) preserves setoff rights only to the extent such rights arose prepetition under applicable non-bankruptcy law.  *Porter v. Internal Revenue Serv. (In re Porter)*, 562 B.R. 658, 660 (Bankr. E.D. Va. 2017); *Blanton v. Prudential-Bache Sec., Inc. (In re Blanton),* 105 B.R. 321, 333 (Bankr. E.D. Va. 1989) ("In Section 553, the Bankruptcy Code does not create a substantive right but merely preserves in limited form the common law right of offset or setoff. In the simplest form of setoff, parties each having an unrelated and prepetition indebtedness to the other may offset their respective debts so that only a net difference, if any, remains owing.").

Virginia law recognizes setoff rights as:

a counter demand of a liquidated sum growing out of a transaction extrinsic to the plaintiff's demand, for which an action on contract might be maintained by the defendant against the plaintiff and which is now exhibited by the defendant against the plaintiff for the purpose of counterbalancing in whole or in part the plaintiff's demand, and, where it exceeds

---

[26] "At the time a member becomes entitled to receive a distribution, he or it has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution."  Va. Code Ann. 13.1-1037.

[27] A claim for reimbursement, whether by guarantee or subrogation, is deemed a prepetition claim against the debtor for purposes of setoff regardless of whether payment was made postpetition.  *Photo Mech. Servs., Inc. v. E.I. DuPont De Nemours & Co. (In re Photo Mech. Servs., Inc.),* 179 B.R. 604, 616 (Bankr. D. Minn. 1995). *See* 11 U.S.C. § 502(e)(2) ("A claim for reimbursement or contribution of such an entity that becomes fixed after he commencement of the case shall be determined . . . the same as if such claim had become fixed before the date of the filing of the petition.").

> the plaintiff's demand of recovering a judgment in his own favor
> for the excess.

*King v. Fulbright & Jaworski, LLP (In re Koch)*, 224 B.R. 572, 576 (Bankr.

E.D. Va. 1998) (quoting *Nat'l Bank and Trust Co. v. Castle*, 196 Va. 686, 695,

85 S.E.2d 228, 233 (1955)).  So long as the creditor is able to establish that it

holds a prepetition "claim" against the debtor, that the creditor owes a "debt"

to the debtor that also arose prepetition,[28] that the claim and debt are mutual

and that each is valid and enforceable, the right of setoff is applicable.  *Mine*

*Serv. Co. v. James River Coal Co.* (*In re James River Coal Co.)*, 534 B.R. 666,

669 (Bankr. E.D. Va. 2015); *In re Koch*, 224 B.R. at 576.  *See also In re*

*Blanton,* 105 B.R. at 333 ("In Section 553, the Bankruptcy Code does not

create a substantive right but merely preserves in limited form the common

law right of offset or setoff. In the simplest form of setoff, parties each having

an unrelated and prepetition indebtedness to the other may offset their

respective debts so that only a net difference, if any, remains owing.").  This

Court has summarized the requisite elements of a setoff as follows:

> [A] creditor must establish by a preponderance of the evidence:
> (1) a debt owed by the creditor to the debtor, which arose prior to
> the commencement of the bankruptcy case; (2) a claim of the
> creditor against the debtor, which arose prior to the
> commencement of the bankruptcy case; (3) the debt and claim
> are mutual obligations; and (4) the debts are subject to setoff
> under nonbankruptcy law; in order to assert the right of setoff
> under § 553

---

[28] The character of a claim is not transformed from pre-petition to post-petition
simply because it is contingent, unliquidated or unmatured when the debtor's
petition is filed.  *Stair v. Hamilton Bk. of Morristown (In re Morristown Lincoln-*
*Mercury, Inc.)*, 42 Bankr. 413, 418 (Bankr. E.D. Tenn. 1984).

*United States v. Ruby (In re Grannan)*, 2002 WL 1760824, *2.

The Court has already addressed the first two of the requirements of *Grannan*, that a debt owed by the debtor to the creditor arose prior to the commencement of the case and that the creditor's claim against the debtor arose prior to the commencement of the case. This third requirement, that of mutuality, requires that the debts "must be between the same parties, the parties must stand in the same right, and the parties must act in the same capacity." *In re James River Coal Co.,* 534 B.R. at 670. Regardless of the nature of the relationship between Belle and the Company, or the extent of the claim that the Company may assert against the Debtors, mutuality appears to exist between the Company and the Debtors. *See Photo Mech. Servs, Inc. v. E.I. DuPont De Nemours & Co. (In re Photo Mech. Servs., Inc.),* 179 B.R. 604, 616 (Bankr. D. Minn. 1995) ("[W]hen an entity acting as a surety or guarantor for the debtor has a claim for reimbursement based on payment to another creditor, or when the creditor has a claim for subrogation, mutuality is evident. This is because such claim and the debtor's debt are owing between the same parties.") Therefore, the elements set forth in *Grannan* have been satisfied and the claim by the Company against its members, to the extent that it is enforceable under applicable nonbankruptcy law, may be set off against the members' distribution rights.

The analysis does not end with a determination that the Company has setoff rights against the bankruptcy estates' distribution claims. The Court must also determine the extent to which setoff is available to the Company.[29]

Belle asserts that the Company's "right of reimbursement" against the Nedricks arises under Va. Code Ann. § 49-27.[30] Despite Belle's assertion, and aside from the unresolved question regarding who speaks for the Company, the nature of the Company's claim is unclear. The Court is unable at this juncture to ascertain whether the Company's claim would be for reimbursement or would more appropriately be characterized as a subrogation claim.[31]

Va. Code Ann. § 49-27 establishes a cause of action for the amount paid as a surety or guarantor, including recovery of interest from the time of payment plus five percent additional damages.[32] It also provides that the

---

[29] *See Davis v. Walker* (*In re Wefelmeyer Constr. Co.*), Adv. No. 94-4344-172, 1997 WL 37574, *6 (Bankr. E.D. Mo. Jan. 14, 1997).

[30] Response to Trustee's Amended Memorandum in Support of Motion for Summary Judgment, Adv. Pro. No. 16-03587-KLP, ECF Docket 30, p. 3 and Adv. Pro. No. 16-03258-KLP, ECF Docket 19, p. 3.

[31] Mutuality exists in either case. *See Photo Mech. Servs., Inc. v. E.I. DuPont De Nemours & Co. (In re Photo Mech. Servs., Inc.)*, 179 B.R. 604, 616 (Bankr. D. Minn. 1995).

[32] Va. Code Ann. § 49-27 provides:

> If any person liable as bail, surety, guarantor or endorser, or any sheriff liable for not taking sufficient bail, or the committee, heir or personal representative of any so liable, pay, in whole or in part, such note, bond or other demand, or any judgment, decree or execution rendered or awarded on account of such liability, the person having a right of action for the amount so paid may, by motion in the court in which the judgment, decree or execution was rendered or awarded, obtain a judgment or decree against any person against whom such right of action exists for the amount so paid, with interest from the time of payment, and five per centum damages on such amount. The person so paying, in whole or in part, any such judgment,

23

payor shall "be substituted to and become the owner of all of the rights and remedies of the creditor for the enforcement and collection of the amount or amounts so paid."[33]  The "rights and remedies" of the Belles are uncertain in light of the Nedricks' bankruptcies and the deficient record in this case.

The Bankruptcy Code addresses subrogation and provides that "an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment."[34]  Treating the Company as Belle's subrogee would require the Court to ascertain the nature

---

decree or execution rendered or awarded on account of such liability, or any such note, bond or other demand, shall, by operation of law, in addition to the remedy above provided, be substituted to and become the owner of all of the rights and remedies of the creditor for the enforcement and collection of the amount or amounts so paid, and shall be deemed the assignee thereof. Executions, or other legal process to which the principal creditor was entitled, may be issued on any such judgment or decree in the name of the original creditor against the person primarily liable for the benefit of the person secondarily liable to the extent to which he has satisfied the original creditor.

But nothing in this section shall be construed to impair or affect in any way the security of the original creditor, or his rights and remedies as to any balance which may be due him. The provisions of this section are cumulative and are intended to protect the rights of any person secondarily liable to the extent to which he has satisfied the obligation of the person primarily liable. All assignments heretofore made of judgments and decrees to persons secondarily liable are hereby validated, and upon the same executions may be issued as hereinbefore provided.

[33] *Id*.
[34] 11 U.S.C. § 509(a).

and extent of, and any defenses to,[35] Belle's claim.  This would also include

an examination of the equities.[36]

Setoffs in bankruptcy are ultimately subject to the Court's discretion.

"The right of setoff is not mandatory, but 'lies within the equitable discretion

of the trial court.' *Ky. Cent. Ins. Co. v. United States (In re Larbar Corp.)*, 177

F.3d 439, 447 (6th Cir. 1999) (*quoting DuVoisin v. Foster (In re Southern*

*Indus. Banking Corp.)*, 809 F.2d 329, 332 (6th Cir.1987))." *Lambert v.*

*Callahan* (*In re Lambert Oil Co., Inc.)*, 347 B.R. 508, 520 (W.D. Va. 2006); *see*

*also In re McKay*, 420 B.R. 871, 877 (Bankr. M.D. Fla. 2009) ("Setoff pursuant

to Section 553 is not mandatory, but is permissive and within the discretion

of the Court.").  The Trustee asserts that Belle's recovery of default interest

at the rate of 18% per annum for a period of approximately five years

(although perhaps paid voluntarily by the Trustee) results in the unjust

enrichment of Belle at the expense of the other creditors of the Nedricks.[37]

Though it may be argued that it would be patently unfair for Belle, an

unsecured creditor as to the Nedricks, to recover a grossly disproportionate

share of the Nedricks' assets, the Court has no other evidence to consider,

such as the activities of any of the participants prior to and during the course

of the bankruptcies, which were initiated in 2010, and why the Belles

---

[35] *See* 11 U.S.C. § 558

[36] *See In re Valley Vue Joint Venture*, 123 B.R. 199, 203 n.7 (Bankr. E.D. Va. 1991)
(Various factors, including a determination that subrogation must not work any
injustice to the rights of others, are typically considered under § 509).

[37] The argument might also be made that payment of the additional amount
requested by Belle might cause Belle to be unjustly enriched at the expense of the
Nedricks' bankruptcy estates.  *See* discussion *infra*.

apparently failed to exercise their rights to enforce the Deed of Trust for over

five years.[38]

In *Blanton v. Prudential-Bache Sec., Inc. (In re Blanton),* 105 B.R. at

333, this Court considered the circumstances in which it would be

appropriate to deny a creditor's setoff rights on equitable grounds.  The Court

cited a line of cases in which a claim of setoff was denied because of illegal or

fraudulent acts on the part of the creditor, including cases where the creditor

had received a fraudulent transfer.  *Id.* at 337-38.  The stipulated facts in the

instant cases would suggest that the Belles may have received a fraudulent

transfer from the Company in the form of the Deed of Trust for which there

was no consideration.  Although the creditor holding the setoff rights is the

Company (perhaps only as Belle's subrogee), permitting the setoff would

enable Belle to reap the full benefit of that transfer to the detriment of other

creditors.  Thus, it seems that a further examination of the equities in this

case is appropriate.

The Trustee appears to concur that the allowance of a setoff would be

tantamount to accepting Belle's contention that the members' distribution

---

[38] The extent to which setoff rights may have been asserted by the parties, whether
in a proof of claim or otherwise, has not been addressed, although there is no basis
to conclude that setoff rights were asserted at any time prior to the commencement
of Belle's complaints.  Some courts have held that a creditor's failure to assert setoff
in its proof of claim results in a waiver of its setoff rights.  *See In re Lykes Bros.
Steamship Co.*, 217 B.R. 304, 312 (Bankr. M.D. Fla. 1997).  *See also In re Britton*, 83
B.R. 914, 918 (Bankr. E.D.N.C. 1988) (failure to timely file proof of claim asserting
setoff rights caused creditor to lose its "allowed claim" status under § 506).  The
record of pertinent acts or omissions affecting the Company's setoff rights in this
case is scant and is inadequate for purposes of granting summary judgment.

rights should be calculated before payment of the Company's obligations. The provisions of the Virginia Limited Liability Company Act make clear, however, that distribution to members is subordinate to payment of the Company's debts, liabilities and obligations. Va. Code Ann. §§ 13.1-1035, 1048, 1049. If the Company had an obligation to pay off the Note, then satisfaction of this obligation would take place before calculating distribution amounts.[39] Since setoff rights are limited to the amount each owes to the other,[40] this distinction is pertinent when determining the extent to which setoff may be available.

## Conclusion

The parties contend that there are only two alternatives and the choice may be made between the two on summary judgment motions. The Court is currently unwilling to accept either choice. The disposition of this matter not only affects the rights of the creditors of the bankruptcy estates but perhaps others who may have claims directly related to the Company. Therefore, the appropriate disposition of these matters requires more than perfunctory treatment.

---

[39] The Court is unwilling to accept Belle's seemingly self-defeating argument based solely on the Stipulations. Under Belle's argument that 1) the entire amount received by the Trustee for the benefit of the Nedricks' bankruptcy estates should first be divided between Belle and the Nedricks' bankruptcy estates, and then 2) the Nedricks' share should be reduced by the $255,429.19 paid to Belle by CHN, it would appear that Belle would be paid with property of the Nedricks' bankruptcy estates. As previously pointed out, this would constitute an impermissible unauthorized postpetition transfer under § 549 of the Bankruptcy Code.

[40] *Durham v. SMI Indus. Corp.*, 882 F.2d 881, 884 (4th Cir. 1989).

Both parties have failed to demonstrate that there is no genuine dispute as to any material fact in connection with any of the counts included in these adversary proceedings. At this stage of the proceedings, the record is inadequate.[41] Accordingly, summary judgment is denied as to each party on each count.

The Court shall enter separate orders denying the motions and cross motions for summary judgment in accordance with this memorandum. A revised pre-trial scheduling order will be forthcoming.

Dated: March 31, 2017

_____/s/ Keith L. Phillips_____
United States Bankruptcy Judge

Copies:

Entered on Docket:  Mar 31 2017

Walton M. Belle
1 Abbotsford Way
Richmond, VA 23227

Paul S. Bliley, Jr.
Williams Mullen
200 South 10th St.
P. O. Box 1320
Richmond, VA 23218-1320

Harry Shaia, Jr., Trustee
8550 Mayland Dr.
Richmond, Va 23294

W. Scott Dillard, II
Spinella, Owings & Shaia PC
8550 Mayland Drive
Richmond, VA 23294

---

[41] Rule 56(c) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 56(c), made applicable by Fed. R. Bankr. P. 7056, sets forth the procedures required to enable the Court to render an informed decision.

Julia C. Nedrick
2901 Brook Road
Richmond, VA 23220

Cecil Hubert Nedrick
2901 Brook Road
Richmond, VA 23220